# Philadelphia & Reading Railroad Company *versus* Long and Wife.

1. Railroad trains may be run at a high rate of speed to reach their greatest utility; but in populous towns and cities the speed must be moderated.

2. If parents permit a child of tender years to wander on a street it is negligence.

3. In this case a child of tender years whilst on a railroad track in a street in a city was killed by a train;—under the evidence it was for the jury to say whether the train was running too fast, or there was negligence otherwise; and whether the child was in the street through the negligence of the parents.

4. Kay *v.* Penna. R. R. Co., 15 P. F. Smith 276, followed.

February 9th 1874. Before AGNEW, C. J., MERCUR and GORDON, JJ. SHARSWOOD, J., at Nisi Prius.

Error to the District Court of *Philadelphia*: No. 24, to July Term 1872.

This was an action on the case brought August 31st 1871, by Jacob V. Long and Mary his wife against The Philadelphia and Reading Railroad Company. The cause of action was the alleged negligence of defendants' servants, which resulted in the death of

[Philadelphia & Reading Railroad Co. *v.* Long.]

Rosanna Long, a child of the plaintiffs, who was run over by one of the defendants' engines.

The defendants' road from Norristown to Philadelphia passes along Cresson street in Manayunk; the depot in Manayunk is at the intersection of Cresson street by Gay street; Cotton street crosses the railroad on Cresson street, and is 744 feet from Gay street in the direction of Philadelphia; between Gay and Cotton streets Levering and Grape streets cross the railroad, Grape street being nearest to Cotton street; from the station at Gay street toward Cotton street there is an up-grade of 32 feet to the mile, which is a "stiff" grade for starting; the track is perfectly straight from the Gay street station to Cotton street. On the 10th of May 1871, the train from Norristown to Philadelphia, after leaving the Gay street depot, near Cotton street crossing, ran over the plaintiff's child, who was about 25 months old; the train, including cars, engine, &c., was 325 feet long; Cresson street is about 50 feet wide; the two tracks of the railroad are in its centre, and are together 16 feet wide. Each side of the street is built up with houses, and many people pass along the street going from Cotton street to the depot. The elevation of the railroad track is higher than the street curb, sloping to the curb on each side, and the road-bed is considerably higher than the sidewalks.

Mary A. Long, plaintiff, testified: "I live in Cresson street, between Cotton and Grape; when I saw the child she came and asked me for a piece of bread, and by that I went to do my house-work and she went out, and the first thing I knew, she was run over; she was not more than a few minutes out of my sight,— about three or four minutes; * * * I did not notice the train pass; we live on the line of the railroad; * * * when I last saw my little girl I gave her a piece of bread and left her in the kitchen; she must have opened the back door and got out through the alley; my mother was in the house with me; I did not notice her go out; I left her in the kitchen; I went to scrub a piece of oil-cloth in the next room; * * * I was in the middle room; you could see from one to the other; I had not noticed her go out; I was by the hearth; she got into the alley; the side door goes right out into the alley; it was latched, but she opened it; she was in the kitchen; I did not miss her at all; I did not know at that time whether she was in the kitchen or out in the street; she had been in the yard playing when she came in and asked me for a piece of bread."

Jacob Peterman testified: "I was on the train which ran over the child; was on hind car on the hind platform of whole train; when I had got on it was going six or seven miles an hour; I am satisfied if I had been off I could not have got on; I heard the whistle blow 'down brakes' when the hind part of the train was crossing Grape street; at that time the front part of the train was

about Cotton street; the hind car of the train was about half way across Cotton street when the train stopped; the train went a whole square; saw the child after the car passed over her; it laid between the up and down tracks." * * *

Samuel A. Moore testified: " The little child was in the middle of the crossing when I first saw her; I saw the train coming; saw the locomotive strike her; I was coming from work; was coming out of an alley below Cresson street, running from Mechanic to Cotton streets; I stepped out of this alley into Cotton street below the railroad, and saw the child and the locomotive; the child had a piece of bread; I heard the whistle while I was five yards in the alley, before I saw the child; she was walking when I first saw her; when I got to the opening of the alley the train was on her; saw the train when it stopped; was about ten or fifteen feet below Cotton street; the hind end; it was going pretty fast when I saw it; first heard the whistle before I got out of the alley into Cotton street; when I got out, I saw the child between the two tracks in the centre of Cotton street; don't think she sat down; it appeared as if she sat down; when I first saw her she was between the two tracks—the up and down tracks—and walking towards me; I then just saw the end of the locomotive; when I got eyes on the child, saw her walk on towards the other track; I just saw the cow-catcher then; the child walked right towards the locomotive; I thought she would sit down when the cow-catcher struck her; don't say she sat down; she could walk, kind of 'trottling' along, when she was struck." * * *

John Nicholls testified: " I live in Cresson street, two doors above Cotton, other side from Mr. Long; was in the house at the time of the accident; three minutes before was at the corner; did not see the child when it was at the corner of Cotton and Cresson streets; saw nothing about the accident; heard whistle after the train passed; saw train from my window; I ran out and had the baby picked up; heard the whistle blow after the train passed the window; saw the cars pass,—going about eight miles an hour; Cresson street is always pretty well crowded—great many people walking and crossing it." * * *

Benjamin Levering testified: " I was in the neighborhood, and had just passed the railroad track when I saw two children together on the upper side of the railroad; they were on the side of Mr. Long's house; I crossed at Cotton street; saw the engine coming; saw it when it left the depot; the child was then on the upper side; I crossed and went up Cresson street when the train passed, and just as I turned round the child went on the track and the cow-catcher struck her; saw the train pass; saw the child struck; the train was going over eight miles an hour; I can tell, for I have lived there all my life; the whistle blowed a few yards before it

[Philadelphia & Reading Railroad Co. *v.* Long.]

struck the child; could not say how many; I was two or three doors above Cotton street." * * *

There was other evidence as to the circumstances of the accident, the speed at which the train was running, &c.

For the defendants, F. H. Wilson, superintendent of the railroad, testified, that a train starting from the depot under eighty pounds of steam could not attain a speed of eight miles an hour by the time it would reach Cotton street. "Six miles an hour was the speed to which trains were restricted in going through Manayunk; that is the speed now; there has been no change in this since we have had the road; trains ring the bells continually from the time they enter Manayunk until they leave it; that is the mode of warning used; the whistle is used only for the purpose of stopping the train, in event of accident." * * *

Daniel Miller, the engineer, testified: * * * "When I left Manayunk station had eighty pounds of steam, that is thirty pounds less than usual; I was on the right-hand side looking ahead; I saw nothing at all; the fireman was ringing the bell; he hallooed me to stop; he was ringing the bell as soon as the engine started; I could not tell exactly where we were when the fireman hallooed me to stop; I had not seen anything on the track up to this time; we were close to Cotton street; I whistled 'down brakes,' reversed engine, and stopped as soon as I could; we went to the next crossing at Mechanic street; one square; stopped within the length of the train; I suppose the train was going five to six miles an hour; * * * can't see from my side anything right in front of the engine, or on the other side, on account of the boiler; there is nothing to prevent me seeing whole track some distance in front of the engine; I was looking out at the time; did not see the child; if the child had been on the track while we were at Grape street, could have seen the child from the side where I was; I could not see right in front of the locomotive, but can see five or six feet in front of it; if the child was standing on the other track, it would be about a half square before she would be shut out of view; the boiler would have shut her out; it is my duty to keep an eye on the track; the fireman rings the bell and tends the fire, the engineer minds the track; he has nothing else to do; I did so on that day, from time we left the depot until the accident. The shortest distance ahead of the engine one could see a person, if on the other track, would be about one-half square—that is, one half way between Grape and Cotton streets; if a person was on the fireman's side of the engine on our track, would be shut out within twenty or thirty feet from the engine; I noticed the steam before I left station; we look at it there, because if the steam gets low we can't get it up; looked at it there, and saw it was eighty pounds; we usually get one hundred and ten pounds there before we leave, if we have time to get it."

William Grady, the fireman, testified as the engineer as to the

[Philadelphia and Reading Railroad Co. *v.* Long.]

amount of steam, the rate of speed, &c. He also testified: "As soon as we left the station I commenced to pull the bell; was ringing it all the way from the station; kept ringing it all the way through Manayunk; we ring the bell always; when anybody is ahead on the track we whistle; * * * when I first saw the child she was stepping on the track—on the left-hand or inside rail of our track—some five or six feet in front of the engine, as near as I could judge; I turned to tell the engineer as soon as I saw it; he did not hear me at first; told him second time; he didn't hear at first on account of the noise of the bell; as soon as he understood me he whistled and stopped; we stopped on the next crossing, about two hundred feet off; it was impossible to have stopped sooner; when I saw the child step on the track it was impossible to have stopped the train; was engaged in ringing the bell all the way down and looking at the steam-gauge; I just happened to look out, and saw the child, for the first time, just as it was stepping in front of the track; the engineer was looking out when I turned to tell him." * * *

The conductor testified that he supposed the rate of speed was about five miles an hour.

The defendants' points, all of which were affirmed, were:—

1. The mere fact of the child having been killed on the defendants' railroad raises no presumption that her death was caused by negligence on the part of the defendants.

2. The verdict must be for the defendants, unless the evidence clearly establishes that the death of the child was caused by want of ordinary care on the part of the agents of the defendants, in the management of the train, and that the parents of the child took all proper precautions for her safety.

3. The men in charge of the train were not bound to anticipate that any person, either infant or adult, would cross the track immediately in front of the engine, and that the defendants are not responsible for an omission to provide against such a contingency.

4. When an infant, less than two years and two months old, is suffered to wander on a railroad track, where trains are constantly passing, the parents of such an infant are guilty of negligence, which precludes their recovering damages for the death of the child by being accidentally run over by a passing train.

5. Should the jury find for the plaintiffs, damages can be assessed only for the pecuniary loss which the evidence shows they have actually sustained, and that neither the bodily sufferings of the child nor the mental sufferings of the parents can be taken into consideration.

The court further charged:—

"Upon these general principles you will consider the facts of the case. The foundation of this action is the negligence of the

[Philadelphia & Reading Railroad Co. *v.* Long.]

defendants. Without this no recovery could be had, even if this was a suit by the child for injury to it. [It is for you to say whether the defendants used such reasonable care and diligence as were required at that time and place.] Negligence is not to be presumed; it is for the plaintiffs to show it. On that subject you have some evidence in relation to the speed of the train; the discrepancy between the witnesses is not very great, it all runs from five to eight miles; Levering said it was about eight miles; the others between five and six miles; it is manifest the rate was between five and eight miles; [it is for you to say whether that rate of speed was excessive, and whether, if excessive, it contributed to the accident;] if the rate of speed did not contribute to the accident, it was not negligence.

" There were only two witnesses who saw the accident, Samuel Moore and Benjamin Levering. You will give particular attention to these two witnesses. * * * [Upon this testimony you will consider whether the negligence of the defendants caused the injury, or whether it was one of those unfortunate accidents which could not be prevented.] If the child was playing near the track, and from fright, or even from heedlessness, or any other motive, suddenly darted in front of the train, the defendants could not be required to foresee and provide against such a contingency. That is one of those misfortunes for which there is no remedy.

" The second inquiry to which you will direct your attention is, did the parents take such care of the child as the circumstances required? The child appears to have been able to lift the latch of the door and go out; the law upon this point has been very strictly laid down, [and the fact that the child is found in the street affords a strong presumption of negligence on the part of the plaintiffs. You will therefore consider whether the mother took reasonable care of the child; if she did not it was negligence], and if you find the parents to have been negligent you must find for the defendants. That is a good defence to this action."

The verdict was for the plaintiffs for $1200. Upon the removal of the record to the Supreme Court by the defendants, they assigned for error the portions of the charge in brackets.

*T. Hart, Jr.*, and *J. E. Gowen*, for plaintiffs in error.— Generally what is and what is not negligence is a question for the jury; but if there be no evidence of negligence, or any facts or circumstances from which negligence could be fairly inferred, the court ought not to submit the question to their determination: Pennsylvania Railroad Company *v.* Barnett, 9 P. F. Smith 259. Conceding the bare assertion that the train was going at the rate of eight miles an hour at the time of the accident, such fact alone cannot justify an inference of negligence. It is the duty of those in charge of a train, when approaching a public crossing, to give

[Philadelphia & Reading Railroad Co. *v.* Long.]

notice by blowing the whistle, ringing the bell, or such other device as may be sufficient to warn travellers of their approach, a sufficient distance from the crossing to afford time for all approaching to stop in a place of safety, or, if on the track, to get out of danger.   It is also their duty to look along the track, and if they see or might, by the use of due care or caution, see any obstruction on the track, to check the train by using every means in their power to prevent a collision : Pittsburg, F. W. & Ch. Railway *v.* Dunn, 6 P. F. Smith 280.   A railroad train, approaching a public crossing with sufficient notice of its approach is not bound so to reduce its rate of speed that, if the warning be disregarded and a traveller cross in front of the train upon the highway, the engine can be checked in time to avoid collision ; the train hands are entitled to presume that no one, either infant or adult, will cross in the face of the train, and to maintain the usual rate of speed of the cars : Telfer *v.* the Northern Railroad Company, 30 New Jersey Law Reports (1 Vroom), 188 ; Shearman and Redfield on Negligence, sect. 478 ; Wilds *v.* Hudson R. Railroad, 29 New York 315.

Where one steps suddenly in front of a moving train, so near that no signal could save him, the railroad company is not negligent in not having given a signal : Hartley *v.* Central Railroad Company, 42 New York (3 Hand) 468.   If there be no negligence, the incapacity of the child creates no liability on the company : Kay *v.* Penna. R. R., 15 P. F. Smith 269; Flowers *v.* Penna. R. R. 19 Id. 210.   They cited on the question of the parents' neglect : Glassey *v.* Pass. Railway, 7 P. F. Smith 172.

*J. Dolman*, for defendants in error.—A jury alone can determine what is negligence, and whether it has been proved : McCully *v.* Clark, 4 Wright 406 ; Telfer *v.* R. R. Co., 30 N. J. 192.   That which in one case would be an ordinary and proper use of one's rights, may by a change of circumstances become negligence and want of due care : Kay *v.* R. R. Co., 15 P. F. Smith 269.   As to the parents' negligence, he cited O'Flaherty *v.* Railroad Co., 3 Am. L. Times 42; Pittsburg, All. & M. Pass. Railway *v.* Pearson, 22 P. F. Smith 169.

The opinion of the court was delivered, February 24th 1874, by

AGNEW, C. J.—This case has been argued by the eminent counsel of the railroad company as if the facts were fixed with the certainty of a special verdict.   If we assume that the child, Rosanna Long, suddenly appeared upon the track, five or six feet ahead of the locomotive on the left-hand side ; that the engineer was in his proper place on the right side of the engine-cab, looking out constantly, but his vision, for several feet in front of the cow-catcher, was obstructed by the boiler and carriage of the engine ; and that

the fireman was at his post ringing the bell, and unable to keep a lookout on the left-hand side of the engine; we might conclude that the death of the child was an accident not within the power of the engineer to avoid, and that the court might have given a binding instruction to the jury. Then, indeed, the rate of speed would be immaterial, for, upon such a sudden appearance of the child on the track, no rate of speed, no matter how slow, could have saved it. But it was because these facts were not so fixed and certain, that the question of negligence must necessarily go to the jury, to ascertain exactly how they were ; and for the same reason the rate of speed became an element properly belonging to the case. Only two witnesses saw the accident happen. One of them, S. A. Moore, coming out of an alley into Cotton street, which crosses Cresson street and the railroad track at right angles, saw the child and the locomotive at the same instant at the crossing. To him the sight and the accident were simultaneous, so that his testimony gives us no information of the previous position of the child while the train was moving up Cresson from Gay street to Cotton. The other witness, Benjamin Levering, saw more. He crossed Cresson at Cotton street; saw the engine coming. Saw it when it left the depot at Gay street. The child was then on the upper side of the road ; after crossing, he himself turned up Cresson street, and in doing this turned his back upon the child ; for he says, just as I turned round the child went on the track, and the cow-catcher struck her, the train then going over eight miles an hour. In his cross-examination he says, when he got opposite to the store at the upper corner of Cotton street, the child was then on the side of Mr. Long's house, and when he got over, the child was between the tracks. Thus it is very evident the testimony of this, the only witness who saw the child before the train reached Cotton street, left it an open question of fact where the child was, and whether she was not visible to the engineer had he kept a constant lookout while the train was moving up Cresson street, before it reached Cotton street, and whether a slower rate of speed would not have enabled the engineer to discover the child, as well as to reverse his engine before it came upon her. Two of the witnesses testify the speed to have been not less than eight miles an hour, and Levering gives as a reason for his belief, that he had lived there all his lifetime, and of course was in the habit of judging of the speed. Thus it is evident that the position of the child while the train was moving up Cresson street, the lookout of the engineer, the place of the fireman, the rate of speed, and all the circumstances, were matters entering into the question of negligence, taken into connection, also, with the all-important fact that Manayunk is a closely built, populous town, Cresson street a public thoroughfare, not of great width, where many persons of all ages, sexes and condition are constantly passing and repassing, and crossing the

tracks of the railroad rightfully.  It was, therefore, clearly the province of the jury to ascertain from the evidence the true position of the child while the train was moving up Cresson street, when and how far the engineer ought to have seen the child in advance of the locomotive, and whether he was keeping a due lookout, and a properly regulated rate of speed, in traversing a populous street. It was in view of this duty of the jury, the instructions of the judge, contained in the first three assignments of error, were apposite and correct.  We disagree emphatically to the position taken by the learned counsel of the railroad company that the rate of speed at the time was not material, and that seven or eight miles an hour is a rate of speed compatible with safety in passing through the streets of a populous town.  While it is true that trains must be run at a high rate of speed to reach their greatest utility, populous towns and cities must be exceptions, when the speed must be moderated in view of the danger of life, limb and property.  Where the people and the trains have a common right to be, and to have a joint use of the highway, the rights of each must be regarded.  These remarks dispose of the first three assignments of error.

There can be no just complaint against that part of the charge recited in the fourth assignment.  It does not contradict the answer to the defendants' fourth point.  The learned judge affirmed all his points, including the fourth, stating that it is negligence and would prevent a recovery for parents to suffer an infant less than two years and two months old to wander upon a railroad track when trains are constantly passing.  In that part of the charge recited in the fourth assignment, the judge said, "that the fact that the child is found in the street affords a strong presumption of negligence on the part of the plaintiffs.  You will, therefore, consider whether the mother took *reasonable care* of the child; if she did not, it was negligence."  To *suffer* a child to wander on the street has the sense of *permit*.  If such permission or sufferance exist, it is negligence.  This is the assertion of a principle. But whether the mother did suffer the child to wander is a matter of fact, and is the subject of evidence, and this must depend upon the care she took of her child.  Such care must be *reasonable* care dependent on the circumstances.  This is a fact for the jury. If she did not exercise this care she was negligent.  What more than this can be demanded of her?  When a railroad runs through a populous city has the company a right to exact a harder measure, and are we to say, as a matter of law, that the citizens are to be imprisoned in their houses, or their children caged like birds, otherwise it is negligence?  Is it negligence for the poor who congregate these crowded streets, unless, even in the summer's heat, they live shut up in the noisome vapors of their closed tenements, without a breath of healthy air?  Is this the life they must lead or

be adjudged to be negligent? This mother gave her child a piece of bread, to satisfy it, closed the kitchen door to keep it in, and went to the next room to scrub the oil-cloth on the floor, and before her labor was finished and in less than five minutes, the mangled body of her little one was brought in and laid before her. We have no reason to believe that her love for her child was less than that of the more favored of her sex, having servants at their beck. Because the child managed to lift the latch and momentarily disappeared, are we to say this was negligence *per se*, and that she *suffered* her child to wander into the street? What sort of justice is that which tells the mother agonizing over her dying child, *your* negligence caused this? *You* suffered your child to run into the jaws of death? We cannot perceive any fault in the railroad company. A speed of eight miles an hour along this populous thoroughfare was all right. We can endorse no such cruel doctrine; but we must say, as we said in Kay *v.* Railroad Company, the doctrine which imputes negligence to a parent in such a case is repulsive to our natural instincts, and repugnant to the condition of that class of persons who have to maintain life by daily toil: 15 P. F. Smith 269.                    The judgment is affirmed.